```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


JAIME M. COOPER                              CIVIL ACTION

VERSUS                                       NO: 06-892

FAITH SHIPPING, ET AL.                       SECTION: "R"(3)
```

## ORDER AND REASONS

Before the Court is defendants' summary judgment motion. (R. Doc. 32). For the following reasons, the Court GRANTS IN PART and DENIES IN PART the motion.

### I.   BACKGROUND

Pacorini USA employed the plaintiff, Jaime Cooper, as a longshoreman. Plaintiff did not have any previous experience working as a longshoreman and had never been on a vessel before. Pacorini assigned plaintiff to work in the hold of the M/V Clipper Faith as part of its operations discharging the ship's cargo. The Clipper Faith had picked up a cargo of baler twine in its No. 4 hold in Cabedelo, Brazil, and then traveled to New Orleans, Louisiana, stopping in Houston on the way to New Orleans. During the voyage, the Clipper Faith encountered rough weather which rocked the vessel. At some point, the vessel rolled to its port side. When the vessel arrived in the Ninth Ward in New Orleans, the hatch covers were opened for Pacorini to

begin discharging the bailer twine.  All parties agree that it was apparent that the cargo had shifted during the voyage and that it was a "bad stow."

On February 15, 2006, Pacorini was discharging the cargo. Pacorini's foreman, Kenny Shears, operated a forklift to remove pallets of baler twine.  He alternated removing pallets from the port and starboard side of the No. 4 hold.  Plaintiff was in charge of picking up broken pieces of wood that could obstruct the forklift's path.  While Shears was operating the forklift on the starboard side of the hold, about five pallets of baler twine on the port side fell and landed on the plaintiff.  Plaintiff suffered a severe spinal cord injury which rendered him a paraplegic.

Plaintiff sued Faith Shipping, Dockendale Shipping, AssuranceForeningen Gard, Companhia Industrial Do Sisal - Cisal, and Bossclip B.V.  The Clipper Faith is owned by Faith Shipping Company, manned by Dockendale Shipping Company, and chartered to Bossclipp B.V. (collectively, these defendants are the "vessel interests," or for purposes of this motion, "defendants"). Plaintiff alleges that defendants' negligence in failing to warn of hidden defects in the cargo, failing to use reasonable care to avoid exposing plaintiff to harm while maintaining control of the equipment and area of the vessel in which plaintiff was performing his duties, and in failing to use reasonable care to

intervene after learning of dangerous conditions, caused his injury and he asserts a cause of action against the vessel interests pursuant to 33 U.S.C. § 905(b).  Pacorini's worker's compensation carrier, the American Longshore Mutual Association ("ALMA") intervened in the action.  The vessel interests move for summary judgment, contending that they cannot be held liable in negligence for plaintiff's injuries.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in

the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**III. DISCUSSION**

In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981), the United States Supreme Court outlined the general duties owed by shipowners to longshoremen under 33 U.S.C. § 905(b).  The Court held that a vessel is liable to a longshoreman under three circumstances: (1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known; (2) if the vessel owner fails to remedy hazards under the control of the ship; and (3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work in the face of it and therefore cannot be relied on to remedy it. *Id.* at 167-178.

**A.     Turnover Duty**

As described by the U.S. Supreme Court in *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92 (1994), the first prong of the *Scindia* test provides that:

> A vessel must exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to person and property.

*Id.* at 98 (internal quotations omitted).  The Court further noted that a corollary to the turnover duty requires the vessel to warn the stevedore on turning over the ship of hidden dangers which are known or would have been known to it in the exercise of reasonable care. *Id.* at 98.  A vessel owner's duty to warn of latent defects in the cargo stow and cargo area is "a narrow one," and does not include dangers which are either obvious or something a reasonably competent stevedore should anticipate encountering. *Id.* at 99, 105; *Clay v. Daiichi Shipping*, 74 F.Supp.2d 665, 671 (E.D. La. 1999), *aff'd*, 237 F.3d 631 (5th Cir. 2000).  "Thus, a vessel owner has not breached its duty to warn if the defect causing the injury is either open and obvious or one that a competent longshoreman should have seen." *Clay*, 74 F.Supp.2d at 670.

It is undisputed by the parties that the cargo aboard the

Clipper Faith was leaning and was generally recognized as "a bad stow." (*See, e.g.,* Shears Dep. at 39:13-14) ("It was leaning when we came in.  It was a bad stow from the get go.")  Pacorini knew the cargo had shifted in the No. 4 hold and Kenny Shears, Pacorini's foreman, had warned the longshoremen to watch out for the leaning cargo. (Shears Dep. at 45:16-18.)  Curry Sabatier, the flagman on duty the day of the accident testified that discharging the cargo "was a slow process from day one." (Sabatier Dep. at 38:2.)  Further, Captain Campana, ALMA's liability expert, testified that it was not unusual for baler twine to collapse or shift in the stow.

> Q. You have surveyed many, many cargoes of bailer twine, correct?
> A. Yes sir, I have.
> Q. Have you ever looked at bailer twine cargo that had either collapsed in the stow or shifted in the stow?
> A. Yes, sir.
> Q. All right.  How many times?
> A. Probably every cargo of bailer twine.
> Q. It's fairly common that that happens with bailer twine, correct?
> A. Correct.

(Campana Dep. at 32:4-12.)  The danger posed by the shifting stow was not only obvious, it was one that should have been "anticipated by a skilled stevedore in the competent performance of its work." *Howlett*, 512 U.S. at 105.

The Court finds that defendants did not breach their turnover duty by not warning Pacorini that the ship had rolled to its port side.  Not only was it apparent that the vessel had

6

encountered rough seas and that the cargo had shifted, but Pacorini had been discharging the Clipper Faith's cargo for three days, and was well aware of the condition of the pallets of baler twine. In *Clay v. Daiichi Shipping, supra*, Judge Fallon found that when longshoremen had been discharging a ship's cargo for about two hours before one of the men was injured, they had been working with the cargo "for too long to claim that the condition of the stow was not open and obvious." 74 F.Supp.2d at 672. Here, plaintiff had been working in the No. 4 hold of the ship for three days, a much more substantial amount of time than two hours, before his injury.

Plaintiff and intervenor contend that although it was open and obvious that the cargo had shifted, defendants failed to warn of the latent danger created when the vessel rolled heavily to her port side causing the cargo in the No. 4 hold to smash into the cargo on the port side, therefore weakening it. ALMA avers that there was no way for Pacorini to know that the cargo on the port side was likely damaged and was weaker and more prone to falling than the rest of the stow. The Court does not find that this creates a genuine issue of material fact. First, ALMA and plaintiff have not introduced any evidence that the cargo on the port side was actually more damaged and weaker than any of the rest of the cargo. Although ALMA contends that the cargo that fell on plaintiff was weaker than the rest, there is no evidence

7

that the vessel's roll to her port side actually made the port side cargo less stable.  Intervenor points to the following testimony of Jason Fernandez, a discharge surveyor:

> Q.   I'm asking about the port side because that's what the report talks about.  Says the ship rolled hard to port.
> A.   Yes.
> Q.   And my question specifically was the momentum you talked about before –
> A.   Yes.
> Q.   – the force, the weight, the entirely of that cargo stow, would have pressed against those two or three tiers of cargo against the port bulkhead.
> A.   That's correct, yes.

(Fernandez Dep. at 53-54.)  The discharge surveyor's testimony consists of agreeing that if the ship rolled to her port side, the weight of the cargo would press against the port side cargo. There is no evidence, however, that the port side cargo that fell on the plaintiff was actually less stable, or that the rolling of the ship eventually caused it to fall.  On the other hand, Kenny Shears testified that although he noticed that all the pallets of baler twine were leaning, he did not see anything particularly unstable about the pallet that fell on the plaintiff, or that it was leaning more than any of the other cargo. (*See* Shears Dep. at 39-40.)

   Further, if the pallets that fell on the plaintiff had collapsed or were substantially weaker than the other pallets, it would have been Pacorini's crew in the hold that would have been the most likely to discover the damage to the pallets. (*See* Campana Dep. at 49) (indicating that if problems with the cargo

8

are not visible from the top of the hold, "you don't know what's underneath until you get there.")  The testimony of one of the discharge surveyors, Florian Hardberger, further supports the conclusion that the shifting of the stow because of the rough weather at sea could be observed in the hold.  When asked how far the vessel rolled to her port side he responded, "The master did not give me a number of degrees.  Based on my experience *and based on looking at the cargo*, I would guess ... she probably sustained a fifteen degree – probably sustained up to fifteen degrees of list." (Hardberger Dep. at 41) (emphasis added.)  This evidence indicates that Pacorini could have observed for itself how the rocking of the vessel in the heavy seas had shifted the cargo in the No. 4 hold.

   Plaintiff and intervenor's argument is also precluded by the Fifth Circuit's recent opinion in *Kirksey v. Tonghair Maritime*, — F.3d —, 2008 WL 2735870 (5th Cir. 2008).  In *Kirskey*, a ship loaded with steel products traveled from Korea to Mexico, encountering heavy seas along the way.  The vessel then arrived in Houston where the plaintiff was part of a group of longshoremen unloading the vessel.  On the day of his accident, plaintiff was working to discharge coiled steel from the vessel's No. 5 hold, when a steel coil tipped over and fell on him, causing him serious injuries.  Plaintiff alleged that the ship's owner violated its turnover duty by failing to exercise ordinary

care to turn over the ship in a safe condition and by failing to warn the stevedore that the vessel had encountered rough seas during the voyage, creating a risk of unstable cargo stow. The Fifth Circuit found that the shipowner had no obligation to warn because the stevedore was well aware of the condition of the cargo stow. *Id.* at *4. The Fifth Circuit further held that the shipowner had "no duty to warn of an incident that creates a risk of shifting cargo and an unstable stow." The Court explained its reasoning as follows: "Knowledge that the vessel encountered heavy seas and weather would not be helpful to the stevedore in assessing the risk its longshoremen would face in unloading the vessel when the stevedore has actual knowledge of the conditions in the hold." *Id*. *See also Marino v. Kent Line Intern., Ltd.*, 2003 WL 22519449, *4 (E.D. Pa. 2003) (holding that vessel owner did not breach duty to warn when it did not inform stevedore that ship had encountered stormy weather because under *Howlett*, the burden of handling shifted cargo rests with the stevedore, and further, the stevedore could actually observe the shifted cargo when it began unloading it). Here, Pacorini's employees had been working in the No. 4 hold for days and were aware that the cargo had shifted and were working carefully to discharge the cargo. Further, Pacorini employees could see the condition of the pallets as they were discharging them. There is no evidence in the record that the pallets that fell on the plaintiff were

damaged more significantly during the voyage than any of the other pallets in the No 4 hold.  If they were more damaged, it was Pacorini's employees who had knowledge of the actual conditions in the hold.  Based on these facts, the vessel interests did not breach any duty to warn by failing to tell the stevedore that the ship had encountered stormy weather at sea and had rolled to her port side. *See Howlett*, 512 U.S. at 104 ("shipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow.").

Although plaintiff has also tried to raise as an issue of fact whether the vessel interests exercised reasonable care in loading the cargo, the Supreme Court has explicitly held that a ship's owner has no duty to oversee the loading of cargo by stevedores. *See Howlett*, 512 U.S. at 104 (rejecting argument that owner is required to make reasonable inspection of cargo operations during or after loading); *see also Scindia*, 451 U.S. at 168 ("[W]e cannot agree that the vessel's duty to the longshoreman requires the shipowner to inspect or supervise the stevedoring operation.").

Finally, the Court finds that there are no genuine issues of material fact as to whether there was a reasonable alternative for Pacorini in discharging the vessel except to walk way away from the job, which is an exception to the open and obvious

11

defense. The open and obvious exception to the turnover duty does not apply "if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-consuming or would force him to leave the job." *Moore v. M/V ANGELA*, 353 F.3d 376, 381 (5th Cir. 2003). As recently noted by the Fifth Circuit this is "a narrow exception," that it has applied in stow cases, as opposed to cases where there is a defect in the ship's equipment, only where the shipowner "controlled the manner and method of the stow *and* created the dangerous condition." *See Kirksey*, 2008 WL 2735870 at *7 (emphasis added). Although plaintiff contends that it was impossible to safely discharge the vessel because all of the cargo was leaning, this narrow exception is inapplicable in this case. That Pacorini had been safely discharging the cargo in New Orleans for three days is evidence that it was possible to safely discharge the vessel. Further, before the ship arrived in New Orleans some of the cargo had been discharged in Houston without incident:

    Q:  The baler twine cargo that had shifted and was to be
        discharged at Houston was done so without any injury to
        your knowledge?
    A:  Without any injury, without any problems. It was very
        slow but –
    Q:  They took their time?
    A:  They took their time.

(Tripathi Dep. at 14-15.)

Further, the dangerous conditions of the stow in this case are indistinguishable from the unstable stow in *Kirksey*. In that

12

case, the district court found that the coils and steel pipe were poorly stowed, leaning, and unstable, making the cargo dangerous to unload.  Nevertheless, and even though the ship had traveled through rough seas, the Fifth Circuit held that "there is no evidence that the *shipowner* negligently created the dangerous condition in the stow, and the exception, therefore is inapplicable." *Id.* (emphasis in original).  Similarly, here, there is no evidence that defendants both controlled the manner and method of the stow and created the dangerous condition. *See Kirksey* at *7 (emphasizing that exception applies in stow cases only when vessel owner controlled the manner and method of the stow <u>and</u> created the dangerous condition).

**B.    Active Control**

The second *Scindia* duty provides that a vessel is liable to a longshoreman if the vessel owner fails to remedy hazards under the control of the ship.  Vessel interests aver that they were not engaged in any active control over Pacorini's discharge operations in New Orleans.  Plaintiff and intervenor contend that the vessel interests maintained active control of the ballast and stability of the vessel, and should have corrected a list to starboard that contributed to the instability of the port side cargo.

The Court finds that there are genuine issues of material fact as to whether the vessel was listing during the discharge

operation, who controlled the vessel's list, and whether that impacted the leaning of the port side cargo. (*See* Hardberger Dep. at 26) (testifying that the list of the vessel to the starboard side "could" have been a contributing factor in the pallets falling over.)  Captain Banajee, a port captain monitoring the discharge, testified that "its possible that ... the baler twine can shift with the list of the ship, too." (Banajee Dep. at 42.) He also testified, however, that he had not observed any listing of the ship when he worked on the vessel the day of the accident. (*Id.*)  This testimony is contradicted by the survey conducted by Mr. Hardberger and Mr. Fernandez, which provides: "We also noted that the vessel exhibited a 1 to 1.5-degree list to starboard at the time of our inspection." (Survey, R. Doc. 54-18 at 7.) Further, although Captain Banajee testified that it is the ship's responsibility to remedy a list, Mr. Hardberger testified that the stevedore can correct the list by removing cargo from the heavy side of the vessel. (*Compare* Banajee Dep. at 43 *with* Hardberger Dep. at 44.)  As there are issues of fact as to whether the vessel was listing at all, whether remedying the alleged list was within the vessel's exclusive control, and whether the alleged list was significant enough to affect the discharge operations and the stability of the cargo, summary judgment is not appropriate.

    **C.**   **Duty to Intervene**

The vessel owner's duty to intervene arises when it has actual or constructive knowledge of a hazard and further has reason to believe that the stevedore improvidently intends to continue to work in the face of it. *Greenwood v. Societe Francaise*, 11 F.3d 1239, 1249 (5th Cir. 1997). The shipowner's duty to intervene "is narrow and requires something more than mere shipowner knowledge of a dangerous condition." *Id.* (citing *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)). "The shipowner ... relies on the competency of the stevedore company." *Scindia*, 101 S. Ct. at 1624.

Although plaintiff and intervenor contend that there is a genuine issue of fact as to whether Anuj Gupta had a duty to tell plaintiff not to stand next to the leaning cargo, the Court finds that there are insufficient facts to implicate the defendants' duty to intervene. The only evidence that Gupta was watching is the statement of Mr. Gupta and Mr. Tripathi about the accident. The statement provides "At that time duty officer (3rd Officer) Mr. Anuj Gupta was watching the cargo operations from main deck." (R. Doc. 54-17.) The statement does not indicate that Mr. Gupta was observing plaintiff and knew that plaintiff was standing in a dangerous position within the hold. Further, there is no evidence that Pacorini, an expert stevedore, was following a procedure so hazardous that anyone could tell its continued use created an unreasonable risk of harm even when the stevedore's

expertise is taken into account. *See Greenwood*, 111 F.3d 1239, 1249 (5th Cir. 1997).  Rather, Pacorini had been unloading the cargo carefully and without incident for days.  Under the facts of this case, the defendant had no duty to intervene.  The vessel interests relied on Pacorini's knowledge and expertise in unloading the cargo.

**IV.  CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

New Orleans, Louisiana, this __28th__ day of July, 2008.

_____
SARAH S. VANCE
UNITED STATES DISTRICT COURT