UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JAIME COOPER                                    CIVIL ACTION

VERSUS                                          NO: 06-892

FAITH SHIPPING, ET AL.                          SECTION: R


### ORDER AND REASONS

Defendant Companhia Industrial Do Sisal-Cisal ("Cisal") has

filed a Motion for Relief from Judgment, for Stay of Execution,

and for Dismissal (R. Doc. 141).  For the following reasons, the

motion is DENIED.[1]


**I. Background**

On February 15, 2006, an accident took place upon the M/V

CLIPPER FAITH.[2]  The vessel had arrived New Orleans after setting

sail from Cabedelo, Brazil, and making a stop in Houston, Texas.

It is undisputed that between Cabedelo and New Orleans the

_____

[1] The Court, in a separate ruling, denied Cisal's request
for an unsecured stay of execution of the judgment and for a
protective order staying post-judgment discovery.  *See* R. Doc.
183.

[2] The background is largely taken from the Court's Order
granting default judgment.  R. Doc. 124.  This decision may also
be located as *Cooper v. Faith Shipping*, No. 06-892, 2009 WL
1789405 (E.D. La. June 22, 2009).

CLIPPER FAITH encountered heavy seas and at one point rolled deeply to its port side. Once it reached New Orleans, stevedores from the American company Pacorini USA, which is not a party to this suit, began unloading its cargo. A portion of this cargo consisted of baler twine manufactured by Cisal. Cisal packaged this twine in spools that were bagged together in groups of two and placed in interlocking fashion on a pallet. Plastic straps were fastened around this bundle and a heavy plastic bag was shrink-wrapped around the entire load.[3] There is no disagreement that the cargo shifted during the voyage and was considered to be a "bad stow."

One of the longshoremen employed by Pacorini was plaintiff Jaime Cooper. At the time of the accident, Cooper was clearing scattered wood pieces out of the path of a forklift that was unloading the pallets of twine. While the forklift was on the other side of the cargo hold, approximately five pallets of twine, each of which weighed nearly 2,000 pounds, fell from a nearby stack onto Cooper and partially buried him. He suffered a severe spinal injury from being crushed by the pallets and was rendered paraplegic.

In February of 2006, Cooper sued a number of entities involved in the shipment of twine aboard the CLIPPER FAITH. He

---

[3] *See also* R. Doc. 141-2 at 1-2 (affidavit of Valdo Araújo da Silva).

served Cisal with process under the Inter-American Convention on Letters Rogatory.[4]  The evidence indicates that Cisal was served on November 9, 2007, through a representative in Bayeux, Brazil, but its acceptance of service indicated that it did not acquiesce to the Court's jurisdiction.[5]  Cisal additionally failed to file an answer or any responsive pleadings.  In December of 2008, all of the defendants but Cisal settled Cooper's claims against them.

Cooper moved for entry of default against Cisal, which the Court granted.[6]  He then moved for default judgment.  The Court held an evidentiary hearing in May of 2009, and it granted the motion for default judgment the following month.[7]  Specifically, the Court determined that it had personal jurisdiction over Cisal because it purposefully directed the shipment of twine toward Louisiana, that Cooper's claim arose out of that contact, and that the exercise of jurisdiction over Cisal would not be unfair or unreasonable.[8]  Furthermore, it noted that Cisal had been properly served but had not made an appearance, which suggested a

---

[4] *See* R. Doc. 13.

[5] R. Doc. 114-3 at 2-3.  Service of process through letters rogatory is proper as between signatory nations to the Inter-American Convention on Letters Rogatory.  *See Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 643 (5th Cir. 1994).

[6] R. Doc. 116.

[7] R. Doc. 124.

[8] *Id.* at 7.

willful failure to appear.[9]  Cooper's factual allegations against
Cisal were thus deemed admitted,[10] and the Court heard expert
evidence on liability and extensive evidence as to Cooper's
damages.  After subtracting the sum for which the other
defendants settled, the Court granted judgment in favor of Cooper
for slightly less than $8.3 million.[11]

The Court entered this judgment on July 2, 2009.  On January
19, 2010, Cisal moved for relief from the default judgment.  The
Court heard oral argument from the parties and it now rules as
follows.

## II. Analysis

Cisal makes two arguments in favor of its motion.  First, it
contends that the judgment is void because the Court lacked
personal jurisdiction over it, and the default judgment must thus
be vacated under Rule 60(b)(4) of the Federal Rules of Civil
Procedure and dismissed under Rule 12(b)(2).  Second, and
alternatively, Cisal argues that the judgment should be vacated
under Rule 60(b)(1) and (6) because its failure to appear was
done at the advice of counsel, that it has an "ironclad" defense

---

[9] *Id.* at 7-8.

[10] *See Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515
F.2d 1200, 1206 (5th Cir. 1975).

[11] R. Doc. 126.

on the merits, and that the interests of justice require that the judgment be vacated.

*A. Personal Jurisdiction*

Cisal is correct that a judgment entered in the absence of personal jurisdiction is void.[12]  Although personal jurisdiction, unlike subject-matter jurisdiction, is subject to waiver, a party does not waive its right to contest personal jurisdiction by failing to appear.[13]  Rule 60(b)(4) "embodies the principle that in federal court, a 'defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds.'"[14]  The Court therefore must determine whether it may exercise personal jurisdiction over Cisal.

A court's exercise of personal jurisdiction is restricted by the Due Process Clause, which protects individuals from being subject to suit in fora in which they have established "no meaningful contacts, ties, or relations."[15]  Personal

---

[12] *System Pipe & Supply Co. v. M/V VIKTOR KURNATOVSKIY*, 242 F.3d 322, 324 (5th Cir. 2001).

[13] *Jackson v. FIE Corporation*, 302 F.3d 515, 523 (5th Cir. 2002).

[14] *Id.* at 522 (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxite de Guinee*, 456 U.S. 694, 706 (1982)).

[15] *Nuovo Pignone v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310,

jurisdiction may be general or specific.  General jurisdiction

obtains when the out-of-forum defendant maintains "continuous and

systematic" contacts with the forum state that would justify

exercising jurisdiction over the defendant even if the

plaintiff's cause of action did not arise from those contacts.[16]

The parties appear to agree that general jurisdiction does not

exist in this case.

The parties dispute whether the Court has specific

jurisdiction over Cisal.  In examining whether specific

jurisdiction exists over a nonresident defendant, a court will

inquire into (1) "whether the defendant has minimum contacts with

the forum state, i.e., whether it purposely directed its

activities toward the forum state or purposely availed itself of

the privilege of conducting activities there," (2) "whether the

plaintiff's cause of action arises out of or results from the

defendant's forum-related contacts," and (3) "whether the

exercise of personal jurisdiction is fair and reasonable."[17]  In

319 (1945)).

[16] *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S.
408, 414-15 & n.9 (1984); *see also Luv N' Care, Ltd. v. Insta-
Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).

[17] *Nuovo Pignone*, 310 F.3d at 378; *see also Burger King
Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Seiferth v.
Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).
A forum state may restrict this inquiry further, but the
Louisiana long-arm statute extends jurisdiction to the limit
acknowledged by the due-process clause.  *See Petroleum
Helicopters, Inc. v. Avco Corp.*, 513 So. 2d 1188, 1192 (La.

the ordinary case, a plaintiff has the burden of making a *prima
facie* case that the first two prongs are satisfied.[18]  If the
plaintiff does so, the burden shifts to the defendant to
demonstrate that exercise of jurisdiction is not fair and
reasonable.[19]  In its examination, a court resolves all disputed
facts in favor of jurisdiction.[20]

The existence of minimum contacts between a non-resident
defendant and a forum state does not require the defendant's

---

1987).

[18] *Seiferth*, 472 F.3d at 271; *see also Luv N' Care, Ltd. v.
Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).  The
"ordinary case" does not necessarily include a 60(b)(4) motion to
vacate a judgment for lack of jurisdiction.  The courts are split
on the issue of which party bears the burden of proof when a
defendant contests personal jurisdiction after the entry of a
default judgment.  *Compare "R" Best Produce, Inc. v. DiSapio*, 540
F.3d 115, 126 (2d Cir. 2008) (defendant bears burden); *and Bally
Export Co. v. Balicar, Ltd.*. 804 F.2d 398, 401 (7th Cir. 1986)
(same); *with Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d
1210, 1217 (11th Cir. 2009) (plaintiff bears ultimate burden);
*Rockwell Intern. Corp. v. KND Corp.*, 83 F.R.D. 556, 559 n.1 (N.D.
Tex. 1979) (same).  The Fifth Circuit has indicated that the
question is unsettled in this circuit.  *See Jackson*, 302 F.3d at
521 n.6; *but see Hazen Research, Inc. v. Omega Minerals, Inc.*,
497 F.2d 151, 154 (5th Cir. 1974) (when defendant challenges
enforcement of default judgment on grounds that court that issued
the judgment in a different forum lacked personal jurisdiction,
"the burden of undermining the judgment rests heavily on the
assailant") (brackets removed).  The Court need not address this
question because the outcome in this case would be the same
regardless of which party bears the burden.

[19] *Seiferth*, 472 F.3d at 271.

[20] *Luv N' Care*, 438 F.3d at 469.

7

physical presence in the forum.[21]  A single act may satisfy this
inquiry if it establishes a substantial connection between the
defendant and the forum state.[22]  This action must be Cisal's
own; a unilateral act by a third party that establishes a
connection with the forum state is insufficient.[23]  The inquiry
is a fact-intensive one, and no single factor is dispositive.
The "touchstone is whether the defendant's conduct shows that it
'reasonably anticipates being haled into court'" in the forum
state.[24]  When, as here, the plaintiff alleges that the
defendant's product caused damage in the forum state, the
minimum-contacts test will be satisfied if the defendant placed
its product into the stream of commerce with the intention or
awareness that it would make its way into the forum state.[25]
Furthermore,

> [w]hen a nonresident defendant commits a tort within
> the state, or an act outside the state that causes

---

[21] *Nuovo Pignone*, 310 F.3d at 379.

[22] *Luv N' Care*, 438 F.3d at 469; *see also Bearry v. Beech
Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987); *Hanson v.
Denckla*, 357 U.S. 235, 253 (1958).

[23] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298
(1980); *see also Luv N' Care*, 438 F.3d at 470.

[24] *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009)
(quoting *Luv N' Care*, 438 F.3d at 470); *see also Ruston Gas
Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir.
1993).

[25] *See McFadin*, 587 F.3d at 762, *Luv N' Care*, 438 F.3d at
470; *Ruston Gas Turbines*, 9 F.3d at 419.

tortious injuries within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor.  Additionally, even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.[26]

Here, Cisal's central contention is that its contacts with Louisiana are insufficient for a court in Louisiana to maintain specific jurisdiction over it.  It asserts that it does no business and has no office or employees in the United States, and that its involvement with the shipment of twine in question ended when it trucked the twine to a Brazilian wharf.[27]  It argues that, before stevedores hired by the CLIPPER FAITH loaded the ship at the wharf, title to the cargo passed to Twine Products Sales, Inc. ("TPS").  TPS is a now-defunct corporation that was incorporated under the laws of Minnesota, but it maintained its principal office in Slidell, Louisiana, where its president worked.[28]  TPS was Cisal's exclusive distributor in the United

_____

[26] *McFadin*, 587 F.3d 753 (quoting *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999)) (internal quotation marks omitted).

[27] *See* R. Doc. 141-3 at 2 (affidavit of Cisal's counsel Carlos Frederico Nobrega Farias).

[28] R. Doc. 141-17 at 1; *see also* R. Doc. 161-3 at 2; R. Doc. 159-3, Ex. A at 1 (registry from Louisiana Secretary of State indicating that TPS's principal business office is in Slidell, Louisiana).  The Louisiana Secretary of State still lists TPS as

States, and Cisal owns a 50% share in TPS.[29]

Robert Perkins, the former president of TPS, avers that TPS was in the business of selling twine throughout the United States, and it purchased its twine from three Brazilian companies, one of which was Cisal. He states that Cisal would manufacture the twine, package it, and deliver it to the Brazilian dock. At this point, Perkins avers that TPS "took delivery and ownership of the twine" in Brazil and shipped it to TPS in Louisiana. Perkins also avers that TPS, not Cisal, determines where the twine will be shipped depending on demand. He declares that "[s]ome twine was shipped to New Orleans and then brought up with barges along the Mississippi River to be shipped from ports along the Mississippi. Other twine was shipped to the East Coast for shipment from there." None of the twine delivered to New Orleans on the CLIPPER FAITH, according to Perkins, was ultimately destined for Louisiana customers of TPS.

In addition, Cisal has produced an invoice for the sale of the twine, dated December 31, 2005.[30] This invoice indicates that the twine was sold for a total of $2,200,000 to TPS, the

_____

"active" and "in good standing." *See* R. Doc. 159-3, Ex. A at 1.

[29] R. Doc. 161-3 at 2 (declaration of Robert Perkins that "Fibrasa and Cisal each owned a 50% share in TPS, and representatives from each company served on TPS's board of directors. Fibrasa and Cisal's ownership interests in TPS continues today.").

[30] R. Doc. 141-17, Ex. F.

address of which is listed as a street in Slidell, Louisiana, and it states that the twine is sold to TPS at its "own risk and peril."

Cisal's director, Clodoaldo Soares de Oliveira Neto, likewise states that Cisal did not sell twine in the United States, and that delivery and sale of the twine at issue was made at the port in Brazil to TPS.[31] He avers that TPS sold the twine to its customers and determined where the twine needed to be shipped based on those customers' needs.[32] Neto further declares that Cisal's responsibilities concluded once the twine was delivered to the dock.

If Cisal were correct that its involvement ended on the Brazilian wharf and that its subsidiary TPS chose to ship the twine to Louisiana and then did so, jurisdiction over Cisal would not exist because the unilateral actions of another party may not establish minimum contacts with the defendant and the forum state.[33] The evidence, however, does not present such a picture. Cisal seeks to present this case as an analogue to *World-Wide Volkwagen*, but it emphatically is not. In fact, the evidence demonstrates that Cisal affirmatively placed its product in the

---

[31] R. Doc. 141-4.

[32] *Id.* at 3-4.

[33] *World-Wide Volkswagen*, 444 U.S. at 298; *see also Luv N' Care*, 438 F.3d at 470.

11

stream of commerce with full awareness that it would reach Louisiana.

Several factors point to this conclusion. First, Cisal was fully aware that the shipments were headed to New Orleans for unloading. Cisal's copies of the commercial invoices from the shipment clearly indicate that the "discharging port" will be New Orleans.[34] These invoices also make clear that Cisal's sales were to its Louisiana-based subsidiary, TPS, which maintained its principal address in Slidell, Louisiana. Cooper, too, has submitted invoices of the shipment from Bossclip, B.V., the Dutch charterer of the vessel. These invoices explicitly list Cisal as the "shipper" of the goods, TPS as the "consignee," and New Orleans as the destination.[35] Other documents in the record similarly make clear that Cisal was aware that the cargo was headed to New Orleans.[36] Neto also noted that he "understands that twine is sometimes shipped to New Orleans and then apparently loaded on barges for delivery to ports along the Mississippi River."[37]

---

[34] R. Doc. 141, Ex. F.

[35] R. Doc. 159, Ex. C.

[36] *See id.*, Ex. D (fumigation certificate listing Cisal as shipper and New Orleans as the port of discharge); *id.*, Ex. E (cargo insurance certificate noting that Cisal entered into an insurance contract covering cargo headed to New Orleans).

[37] R. Doc. 141-4 at 4.

12

In addition, the transaction between Cisal and TPS did not consist of Cisal's merely dropping its products off at the wharf in exchange for payment. In fact, Cisal was not paid immediately; it retained a financial interest in the twine after it had reached the United States because the cargo was on consignment to TPS. Cisal would not be paid until after TPS sold the twine in the United States. Neto, Cisal's director, admitted that TPS was "required to make payment to Cisal under the invoices only once it receives payment for the twine."[38]

Further, Cisal paid for insuring the cargo and shipping it to New Orleans.[39] This is noted on Cisal's invoices for the shipment, which notes that "the sellers (Cisal - Companhia Industrial Do Sisal) take care of the insurance and pay[] the freight up[ ]to the discharging port — New Orleans - USA."[40] Shipping and insurance were paid for and arranged by Cisal, and were apparently later invoiced to TPS.[41]

---

[38] R. Doc. 141-4 at 4.

[39] *See* R. Doc. 159, Ex. D; R. Doc. 141-4 at 4.

[40] R. Doc. 141, Ex. F.

[41] R. Doc. 141-17 at 1-2. In his affidavit, Perkins indicates both that the shipment was marked "F.O.B." or "free on board" — which signifies that TPS bore the risk for the loss of the shipment — and that it was "C.I.F." A C.I.F. designation means that the price of the goods includes cost, insurance and freight. *See Steuber Co., Inc. V. Hercules, Inc.*, 646 F.2d 1093, 1096 n.1 (5th Cir. 1981); *C. Itoh & Co. (America), Inc. v. M/V Hans Leonhardt*, 719 F. Supp. 479, 484 n.4 (E.D. La. 1989).

The evidence additionally reflects that Cisal kept informed about the state of the partially damaged cargo when it reached New Orleans and received updates about the progress of unloading there.[42]  On February 7, 2006, a Cisal employee gave a secretary at TPS the contact information for the insurance representative in New Orleans.[43]  Further, Cisal had repeated contacts with TPS regarding the state of the cargo and the status of the insurance payments, and interacted directly with the insurer of the cargo.[44]  Specifically, the insurer of the cargo requested a report on the shipment from Cisal.[45]  Indeed, the insurer apparently negotiated the loss with Cisal; Cisal contacted TPS to inform it of the sum that the insurance company would pay for the damaged cargo and asked TPS for "a letter stating that the invoice of clipper faith [sic] will be settled without discount upon receipt of reimbursement from Insurance company."[46]  Perkins responded by saying that TPS agreed to make the payment, and once the insurance company had made payment to TPS, TPS would forward

---

[42] R. Doc. 159-4, Ex. F.

[43] *Id.*, Ex. G.

[44] *Id.* Exs. H, I, J, N.

[45] *Id.*, Ex. J.

[46] *Id.*, Ex. K.

the payments to Cisal.[47]  TPS and Cisal engaged in additional

extended discussions about the state of the shipment, including

attempts to salvage damaged twine, and the status of the

insurance payments into 2007, all of which belie Cisal's

assertion that it had no involvement with the cargo once it

dropped it off at the wharf in Brazil.[48]

These facts are sufficient to support personal jurisdiction

over Cisal.  The Fifth Circuit "has consistently held that 'mere

foreseeability or awareness is a constitutionally sufficient

basis for personal jurisdiction if the defendant's product made

its way into the forum state while still in the stream of

commerce.'"[49]  Although some of the facts surrounding this

relationship are in dispute, the Court is bound to resolve these

disputed facts in favor of jurisdiction.[50]

Again, when Cisal placed its products in the stream of

commerce, it was aware that they were sold to its subsidiary,

which maintained its principal presence in Louisiana, and that

the goods were bound for Louisiana and would be unloaded in New

---

[47] *Id.*, Exs. L, O (email from Robert Perkins stating that
TPS would "forward [the] cash flow" from the insurance payments
to Cisal).

[48] *Id.*

[49] *Luv N' Care*, 438 F.3d at 470 (quoting *Ruston Gas
Turbines*, 9 F.3d at 419).

[50] *Luv N' Care*, 438 F.3d at 469.

Orleans. The invoices for the twine explicitly indicate that New Orleans would be the destination of the voyage, and these invoices as well as other documents list Cisal was the "shipper" of the cargo to Louisiana, and TPS merely as the consignee. These invoices establish Cisal's awareness that after the voyage the products would be unloaded in Louisiana, and because Cisal knew this, it must have known that these products were capable of causing harm in that state.[51]

Furthermore, it is beyond dispute that Cisal's involvement in the shipment did not terminate at the Brazilian wharf. Rather, Cisal paid for the insurance and the shipping of the goods from Brazil to Louisiana. These costs were invoiced to TPS along with the price of the goods, and Cisal would not be paid under the invoices until the twine was sold at its ultimate location.[52] Furthermore, Cisal dealt with the insurer of the shipment and maintained communications with TPS about the state of the damaged shipment, its salvage, and insurance proceeds. It

---

[51] *Cf. Nuovo Pignone*, 310 F.3d at 381 (noting that the defendant "should have considered the possible devastation that its choice of a defective onboard crane might cause in Louisiana").

[52] This financial interest in the shipment of twine appears to be a direct one insofar as Cisal is paid only after the particular twine is sold. This interest is thus unlike the financial benefits that were held to be insufficient in *World-Wide Volkswagen*, in which the defendant was alleged to have sold a mobile product that could be service throughout the country, including the forum state. *See* 444 U.S. at 298-99.

should be recalled that the purchaser of the twine, TPS, was Cisal's half-owned subsidiary and its exclusive United States distributor, which had its principal place of business in Louisiana.[53]

The evidence in this case thus establishes that TPS did not, like the motorists in the *World-Wide Volkswagen* case, simply take the cargo from Cisal and, without Cisal's knowledge or awareness, transport it to Louisiana.[54] That Cisal's cargo was unloaded in New Orleans can in no sense be considered a random or fortuitous event. Rather, Cisal had full awareness that the shipment was headed to Louisiana and would be unloaded there, even if Louisiana was not intended to be the twine's final destination. By paying for the freight, arranging the insurance, and retaining a financial interest in the cargo, it played a significant role in the transportation of the twine to Louisiana as well. These contacts amount to more than the mere signing of a contract, which alone would be insufficient to confer jurisdiction.[55] In sum, they are sufficient for a *prima facie* showing that

---

[53] Oral Arg. Trans. 2, Mar. 31, 2010; R. Doc. 159, Ex. A at 1.

[54] *See* 444 U.S. at 298-99.

[55] *See Dickson Marine Inc. v. Panalpina, Inc.* 179 F.3d 331, 337 (5th Cir. 1999). It should be noted that the Court does not today hold that Cooper has demonstrated that the corporate separateness between Cisal and TPS has been overcome. *See id.* at 338. The stream-of-commerce theory does not require that all entities in the chain of custody be the same corporate entity.

jurisdiction exists over Cisal because of a substantial instance of contact with Louisiana.  Furthermore, because Cooper was injured by this particular shipment, his cause of action arises out of Cisal's contact with Louisiana.

This conclusion is supported by the relevant case law.  In the 1993 Fifth Circuit decision in *Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.*, for example, a third-party plaintiff sued a third-party defendant in a Texas court for breach of contract, breach of warranty, and strict products liability.  The third-party defendant was a Delaware corporation with its principal place of business in Minnesota.  Although it had numerous business contacts with Texas, it did not conduct business or employ workers there, had not committed a tort there, and was not bound to perform any contractual obligations in that state.[56]  The third-party defendant shipped the offending items F.O.B. from Minnesota, and they were then delivered to Texas.  The court found that minimum contacts existed between the third-party defendant and Texas.  The third-party defendant "intentionally placed its products into the stream of commerce by delivering them to a shipper destined for delivery in Texas.  At the time the good left [its] plant in Minnesota, [it] not only *could have foreseen* that the products might end up in Texas, it *knew* as a fact that the products were going to be delivered to a

---

[56] 9 F.3d at 417.

18

specific user in Houston, Texas."[57]  The court found the exercise of personal jurisdiction to be justified.

Furthermore, in *Nuovo Pignone v. STORMAN ASIA M/V*, handed down by the Fifth Circuit in 2002, the defendant contracted with the plaintiff to provide safe and reliable transport for a large reactor from Italy to Louisiana.[58]  The defendant entered into other subcontracts for the operation of a vessel to perform this transport.  When a crane on the vessel broke at the Port of New Orleans and damaged both the pier and the reactor, the plaintiff sued in Louisiana and the court found that sufficient contacts supported jurisdiction.[59]  The court held that the defendant specifically agreed to supply a vessel that would safely transport the cargo from Italy to Louisiana, that it should have anticipated that its contractual obligations might subject it to suit there, and that it "cannot now claim that its contact with Louisiana was merely fortuitous, random, or attenuated after it entered into a contract specifying the state as the point of destination."[60]  Furthermore, the court found that the defendant should not be insulated from liability simply because only its subcontractors were present at the time of the accident.  "In a

---

[57] *Id.* at 420 (emphasis in original).

[58] 310 F.3d at 377.

[59] *Id.* at 379.

[60] *Id.*

broader sense, [the defendant] should not be permitted to escape personal jurisdiction by intertwining itself in a multi-layered contractual arrangement. . . . As a voluntary member of the economic chain that brought the reactor to Louisiana, [it] purposely has availed itself of the privilege of conducting business in that state."[61]

Finally, in the 2006 case of *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, the Fifth Circuit held that minimum contacts were established between Louisiana and a Colorado-based corporation.[62] The defendant manufactured products that allegedly infringed the trademark of a Louisiana company, and it sold these products to Wal-Mart and "a few other vendors." The defendant did not do any of its own shipping. Rather, "trucks or third-party carriers assigned by Wal-Mart transport the [products] from [defendant's] dock in Colorado Springs to one of twenty-six distribution centers worldwide."[63] The vendor agreement between defendant and Wal-Mart indicated that Wal-Mart took ownership of the products when they were loaded in Colorado, and defendant alleged that it had "no knowledge" of the products' destinations until it learned them in discovery.[64] The orders, however, were filled through an

---

[61] *Id.*

[62] 438 F.3d at 468.

[63] *Id.*

[64] *Id.*

electronic system that produced invoices that indicated the destination of the products.

The court held that minimum contacts were established because defendant filled numerous purchase orders bound for Louisiana. The court discounted defendant's claim that it did not know the destination of the products. "This claim is implausible and could not defeat jurisdiction even if true. It is eminently foreseeable that [defendant's] products would reach the market indicated on the company's invoices."[65] The defendant gained substantial revenue from sales to Louisiana, and the court found that minimum contacts could not be defeated simply because the destinations were indicated on the electronically produced purchase orders.[66] These cases support a holding that Cisal, by placing its products in the stream of commerce with full knowledge that they would be unloaded in Louisiana, should have reasonably expected to be haled into a Louisiana court if the products caused damage there.

Cisal, however, contends that the stream-of-commerce theory does not apply in this circumstance because the theory "is limited to specific personal jurisdiction for a products

---

[65] *Id.* at 471.

[66] *Id.; see also id.* at 471 n.9 ("a contrary holding would permit foreign defendants to avoid jurisdiction in the United States by structuring their data systems to shield employees from knowledge that their products ultimately will reach the United States").

liability claim in a state where a manufacturer has purposely sent its product for purchase by a consumer."[67]  It correctly states that the theory "permits the exercise of personal jurisdiction over a nonresident defendant that 'delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.'"[68]  It also contends that it is not subject to personal jurisdiction in every state through which its products pass on the way to a consumer.

This argument fails.  Cisal is correct that the stream-of-commerce theory does permit the exercise of personal jurisdiction over a company that places its products into commerce and expects that they will be purchased by consumers in the forum state. This is not, however, the outer boundaries of the theory.  The Fifth Circuit has held that "mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce,"[69] and that "[w]here a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be

---

[67] R. Doc. 161-2 at 8.

[68] *Seiferth*, 472 F.3d at 273 (quoting *World-Wide Volkswagen*, 444 U.S. at 298).

[69] *Luv n' Care*, 438 F.3d at 470 (quoting *Ruston Gas Turbines*, 9 F.3d at 419).

amendable to suit in that state."[70]  Here, Cisal was undisputably

aware that its products would make their way to Louisiana while

still in the stream of commerce, and — because it was selling

products to a Louisiana-based company — it availed itself of

Louisiana's market for its goods.  The Fifth Circuit's decisions

contain no evident limitation on the application of the stream-

of-commerce theory when the injured party is not the ultimate

consumer of the goods.

In fact, the Fifth Circuit has expanded the theory beyond

the simple products-liability context.  In *Luv n' Care*, the court

noted that it had been "reluctant to extend the stream-of-

commerce principle outside the context of products liability

cases," but it has found jurisdiction proper "where the same

public policy concerns that justify use of the stream-of-commerce

principle in the products liability context are present."[71]

Accordingly, application of the theory is appropriate in contexts

such as breach of warranty or trademark infringement.[72]  The

present suit is not a traditional products liability suit brought

by the ultimate consumer of the good, but it is highly similar,

and is certainly more analogous to a traditional products-

---

[70] *Id.*

[71] *Id.* at 472-73 (quoting *Nuovo Pignone*, 310 F.3d at 381).

[72] *See Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1073-74 (5th Cir. 1990); *Luv n' Care*, 438 F.3d at 473; *see also Nuovo Pignone*, 310 F.3d at 381.

liability case than a suit involving a breach of warranty or a trademark infringement. Cisal's product caused severe personal injury to a Louisiana resident while in Louisiana. This resident was not the end user of the product. But when, as here, a nonresident defendant makes a direct sale to a company based in the forum state, its products cause damage there, and it has such connections that it should reasonably anticipate being haled into court there, the Court sees no reason not to apply the stream-of-commerce theory simply because Cooper was not the end user or ultimate consumer of the product.

Cisal's contention that it is not subject to jurisdiction in every state through which its products travel ignores the evidence before the Court. Clearly, the packages of twine do not become Cisal's "agent for service of process" in the United States.[73] This is not, however, what the Court holds today. Here, Cisal made a direct sale to a Louisiana-based company and arranged for the products to be sent to and unloaded in New Orleans. The evidence does not demonstrate that Cisal had any knowledge of where the products were headed after they reached New Orleans.[74] And it argues quite vigorously that TPS is a

_____

[73] *See World-Wide Volkswagen*, 444 U.S. at 296.

[74] Again, Cisal had a financial interest in the goods and was concerned with the volume of TPS's sales in the United States. *See* R. Doc. 141, Ex. F; R. Doc. 159, Ex. Q, R. But these facts do not establish that Cisal actually knew where the goods were being sold. It appears that, from Cisal's

separate, discrete, and independent entity from Cisal.  Its
personal-jurisdiction argument is thus that it sold twine
directly to a Louisiana-based company and arranged for the
shipment to be sent to Louisiana, where it caused damage to a
Louisiana resident.  But, according to the argument, Cisal is not
subject to jurisdiction *in Louisiana* because TPS — again, a
separate and independent entity — *intended* to send the twine
elsewhere.  This argument does not appear to be supported by any
authority.  Cisal knowingly benefitted from Louisiana's market
for its products and it placed its products into the stream of
commerce with the knowledge that they would reach Louisiana.
This is sufficient for the exercise of personal jurisdiction.

Next, Cisal points to two cases to support its position and
repel a finding of personal jurisdiction.  In the 1978 case of
*Charia v. Cigarette Racing Team, Inc.*, the Fifth Circuit found
that sufficient minimum contacts did not exist for a Louisiana
court to exercise jurisdiction over a Florida corporation that
shipped a boat costing several thousand dollars F.O.B. to
Louisiana.[75]  The court found that the single F.O.B. shipment was
insufficient to establish sufficient contacts.  The court further
found that a handful of additional sales in Louisiana did not
suffice to establish that the defendant availed itself of

_____

perspective, the products' journey ended in New Orleans.

[75] 583 F.2d at 185-86.

25

Louisiana's laws.  The defendant "sold four boats in Louisiana in a 5-year period, sales which we consider, in the circumstances of this case, to be isolated and sporadic.  [The defendant's] isolated sales did not involve purposeful conduct within Louisiana so as to avail itself of the benefits and protections fo Louisiana's laws."[76]

*Charia*, however, involved a comparatively insubstantial sale of a single item of small value.  The court also found the F.O.B. term to be of considerable significance under the terms of the transaction.  The Fifth Circuit has since determined, with respect to F.O.B. clauses, that jurisdiction "'does not depend on the technicalities of when title passes;' rather, jurisdiction may attach both to manufacturers who supply their own delivery systems and to those that make use of the distribution systems of third parties."[77]  The existence of an F.O.B. term is thus a factor to consider in a court's minimum-contacts analysis, but it "does not prevent a court from exercising personal jurisdiction over a non-resident defendant where other factors, such as the quantity and regularity of shipments, suggest that jurisdiction is proper."[78]  Here, the shipment out of which Cooper's claim

---

[76] *Id.* at 189.

[77] *Luv N' Care*, 438 F.3d at 471 (quoting *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n.8 (5th Cir. 1980)).

[78] *Id.* at 471-72.

arises was a significant one. Cisal's invoices list the price of
the entire shipment as $2.2 million, $1,963,000 of which was for
the twine itself.[79] The gross weight of the shipment purchased
by TPS was more than four million pounds, and more than ten
million pounds of baler twine was loaded onto the CLIPPER FAITH
at the Brazilian port.[80] Furthermore, evidence suggests that
Cisal had sent other shipments to Louisiana as well,[81] and
because TPS was Cisal's exclusive U.S. distributor and was based
in Louisiana, all sales that Cisal made to TPS amount to economic
interactions with Louisiana. That Cisal argues that it tendered
the twine to TPS F.O.B. on the Brazilian dock, therefore, does
not automatically insulate it from jurisdiction.[82]

The Fifth Circuit has also distinguished *Charia*'s reliance
on the F.O.B. clause by noting that, in that case, the term
reinforced the holding that jurisdiction in the forum state was

---

[79] R. Doc. 141, Ex. F.

[80] *Id.*, Ex. F, G.

[81] *See* R. Doc. 141-4 at 4 (declaration of Neto that he
"understand[s] that twine is sometimes shipped to New Orleans and
then apparently loaded on barges for delivery to ports along the
Mississippi River, and is also shipped to ports on the east coast
for delivery from there").

[82] Although Perkins described the shipment both as F.O.B.
and C.I.F., the two are the same in the sense that "title and the
risk of loss passed to the purchaser upon delivery of the
merchandise to the freight forwarder." *Amusement Equipment, Inc.
v. Mordelt*, 779 F.2d 264, 266 (5th Cir. 1985). Here, the risk of
loss of the shipment during transit fell upon TPS. *See* R. Doc.
141, Ex. F.

unforeseeable. "Where jurisdiction is otherwise foreseeable, a F.O.B. term cannot deprive the court of jurisdiction over the defendant."[83] This is especially true here, when there are invoices in the record establishing that Cisal knew that the goods were to be shipped to New Orleans and in fact played a substantial role in acquiring the insurance for the Louisiana-bound shipment.[84] Furthermore, TPS, the purchaser of the goods in question, was Cisal's subsidiary and exclusive U.S. distributor and had its principal place of business in Louisiana. *Charia* thus does not control this case.

Cisal also relies on the unpublished Fifth Circuit case of *Southern Copper, Inc. v. Specialloy, Inc.*[85] There the plaintiff Texas-based corporation placed an order for copper-nickel billets from an Illinois company. Once the goods had been produced in Illinois, they were delivered to the plaintiff F.O.B. in Chicago, and the plaintiff arranged and paid for the delivery of the billets in Texas. After delivery, the plaintiff found them to be defective. The court held that any connection between the

---

[83] *Luv N' Care*, 438 F.3d at 472 n.11.

[84] The Fifth Circuit has also noted, in the context of distinguishing *Charia*, that the case was decided before several watershed cases of the United States Supreme Court that refined the contours of personal jurisdiction, such as *World-Wide Volkswagen* and *Burger King v. Rudzewicz*. *See Nuovo Pignone*, 310 F.3d at 379 n.4.

[85] 245 F.3d 791, 2000 WL 1910176 (5th Cir. Dec. 22, 2000) (table, text in Westlaw).

Illinois defendant and Texas was the result of plaintiff's unilateral activity, and that some communications leading up to the contract did not establish personal jurisdiction.[86] Examining the plaintiff's stream-of-commerce theory, the court found that the defendant did not purposely avail itself of the privilege of doing business in Texas because plaintiff took possession of them in Illinois, and defendant's other contacts with Texas were insignificant. "[I]t appear[ed] that Specialloy permissibly structured its dealings with Southern Copper to avoid being haled into court in Texas."[87]

Even if *Southern Copper* were precedential, the facts recounted in that case little resemble the facts here. There, the plaintiff, not the defendant, directed the products to the plaintiff's home forum after picking them up from the defendant,[88] and there is only scanty indication that the defendant knew where its products would ultimately end up. The case also relies heavily on the existence of an F.O.B. term in the shipment contract. As explained above, the Fifth Circuit in a later opinion explained that an F.O.B. term is not dispositive

---

[86] *Id.* at *3-4.

[87] *Id.* at *4 n.2.

[88] *Id.* at *4 ("Southern Copper took possession of the billets in Illinois"). Elsewhere the court notes that the plaintiff employed an independent carrier to take the goods from defendant's forum to plaintiff's. *Id.* at *3. The opinion therefore appears to refer to constructive possession.

of the outcome when other contacts have been established.[89]
Furthermore, that clause of the contract is in part contradicted
by Cisal's course of dealing; although it appears that TPS did
bear the ultimate risk of loss of the cargo, the cargo was still
on consignment and the shipment was arranged and paid for by
Cisal. Finally, *Southern Copper* gives little indication of how
significant the individual sales were, and thus little guidance
for this Court to determine whether those sales resembled the one
here. Cisal's reliance on that case is thus unavailing.

All told, the evidence in this case establishes this: Cisal
sold a large, multi-million dollar shipment of its products to
its half-owned, Louisiana-based subsidiary and exclusive U.S.
distributor, and in so doing it directed the goods toward the
Louisiana with full, documented knowledge that it would arrive in
New Orleans and be unloaded at a New Orleans port. This shipment
was not an isolated occurrence. Just as one who arranges for the
shipment of a crane to a particular forum should be aware that
the crane could cause damage when being unloaded there, a company
that directs a significant shipment of twine to Louisiana should
be aware that the products might cause damage while being
unloaded in that state, and it should reasonably anticipate being

---

[89] *See Luv N' Care*, 438 F.3d at 471-72.

haled into court there.[90]  The Court finds that the evidence
establishes a *prima facie* case that personal jurisdiction exists
over Cisal, and that the cause of action arises out of those
contacts.

Cisal now has the burden of establishing that exercise of
jurisdiction would not be fair and reasonable.[91]  It contends
that it would be overly burdensome for a Brazilian company and
its non-English-speaking employees to defend themselves in an
American court for the conduct at issue.

In examining the fairness and reasonableness of the exercise
of personal jurisdiction, a court will examine "(1) the burden on
the nonresident defendant, (2) the forum state's interest,
(3) the plaintiff's interest in securing relief, (4) the interest
of the interstate judicial system in the efficient administration
of justice, and (5) the shared interest of the several states in
furthering fundamental social policies."[92]

Here, the burden on Cisal, a Brazilian company, in defending
itself in an American court is significant.  Furthermore, a court
must exercise "[g]reat care and reserve . . . when extending
[American] notions of personal jurisdiction into the

---

[90] *See Nuovo Pignone*, 310 F.3d at 381; *Seiferth*, 472 F.3d at
273; *World-Wide Volkswagen*, 444 U.S. at 297.

[91] *Seiferth*, 472 F.3d at 271.

[92] *McFadin*, 587 F.3d at 760 (quoting *Luv N' Care*, 438 F.3d
at 473).

international field."[93]  It must give significant weight to

"[t]he unique burdens placed upon one who must defend oneself in

a foreign legal system."[94]  This factor weighs heavily in Cisal's

favor.

Nevertheless, "[w]hen minimum contacts have been

established, often the interests of the plaintiff and the forum

in the exercise of jurisdiction will justify even the serious

burdens placed on the alien defendant."[95]  Here, although it may

be burdensome, it is neither unfair nor unreasonable to ask Cisal

to defend itself in a Louisiana court for damage allegedly caused

by its products once Cisal placed them in the stream of commerce

with the awareness that they would reach Louisiana.

Furthermore, the interest of Louisiana in providing the

possibility of redress for citizens who are injured by the acts

of nonresident defendants is undeniably significant, and it

cannot be doubted that Cooper's interest in gaining relief is

considerable.  The Court additionally sees no reason why exercise

of personal jurisdiction in this circumstance would offend and

not serve the administration of justice or the furtherance of

fundamental social policies.  For these reasons, the Court

---

[93] *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano County*, 480 U.S. 102, 115 (1987); *see also Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 716 (5th Cir. 1999).

[94] *Asahi*, 480 U.S. at 114.

[95] *Id.*

determines that exercising personal jurisdiction over Cisal is not unfair or unreasonable, and Cooper has made his *prima facie* case that jurisdiction is proper.

## B. Vacation of the Judgment Under Rule 60(b)(1) and (6)

Cisal argues that the judgment must be vacated under Rule 60(b)(1) and 60(b)(6).[96] These subsections indicate that a court may relieve a party from a final judgment or order on the grounds of "mistake, inadvertence, surprise, or excusable neglect," or "for any other reason that justifies relief." The Rule "should be liberally construed in order to do substantial justice."[97] This consideration is taken to mean that "although the desideratum of finality is an important goal, the justice-function of the courts demands that it must yield, in appropriate circumstances, to the equities of the particular case in order that the judgment might reflect the true merits of the cause."[98] Motions brought under Rule 60(b) "are directed to the sound discretion of the district court," and the court considers eight factors when ruling on a motion to vacate a default judgment

---

[96] Cisal invokes Rule 60(b)(6), but it makes no real arguments under that Rule and instead focuses on Rule 60(b)(1). The Court therefore examines the latter Rule.

[97] *Seven Elves, Inc. v. Eskenazi*, 635 F.3d 396, 401 (5th Cir. Unit A 1981).

[98] *Id.* at 401-02.

under Rule 60(b):[99]

> (1) That final judgments should not lightly be
> disturbed;
> (2) That the Rule 60(b) motion is not to be used as
> substitute for an appeal;
> (3) That Rule 60(b) should be liberally construed in
> order to achieve substantial justice;
> (4) Whether the motion was made within a reasonable
> time;
> (5) Whether, if the judgment was a default or a
> dismissal in which there was no consideration of the
> merits, the interest in deciding cases on the merits
> outweighs, in the particular case, the interest in the
> finality of judgments, and there is merit in the
> movant's claim or defense;
> (6) Whether, if the judgment was rendered after a trial
> on the merits, the movant had a fair opportunity to
> present his claim or defense;
> (7) Whether there are intervening equities that would
> make it inequitable to grant relief; and
> (8) Any other factors relevant to the justice of the
> judgment under attack.[100]

Furthermore, when, as here, a defendant challenges the

judgment under Rule 60(b)(1), a court applies a standard of "good

cause."[101]  Good cause "is not susceptible of precise definition,

and no fixed, rigid standard can anticipate all of the situations

that may occasion the failure of a party to answer a complaint

---

[99] Although Cisal's challenge to personal jurisdiction was
also brought under Rule 60(b), these factors do not apply in that
context.  This is because a court lacks discretion to vacate a
default judgment for want of personal jurisdiction.  Either the
judgment is void for lack of jurisdiction or it is not.  *See
Magness v. Russian Federation*, 247 F.3d 609, 619 n.19 (5th Cir.
2001); *Jackson*, 302 F.3d at 524.

[100] *Magness*, 247 F.3d at 618 (citing *Seven Elves*, 635 F.2d
402).

[101] *In re OCA, Inc.*, 551 F.3d 359, 369-71 (5th Cir. 2008).

timely."[102]  In determining good cause, a court examines whether

the failure to answer the complaint was willful, whether setting

it aside would prejudice the adversary, and whether a meritorious

defense is presented.  A court may also consider whether the

public interest was implicated, whether there was significant

financial loss to the defendant, and whether the defendant acted

expeditiously to cure the default.[103]  A court need not consider

all these factors, but the Fifth Circuit has consistently held

that if a court finds that the failure to answer was willful, it

may decline to make any further findings and exercise its

discretion not to grant relief from the default judgment.[104]

    There is no disagreement that the failure to answer the

_____

    [102] *In re Dierschke*, 975 F.2d 181, 183 (5th Cir. 1992).

    [103] *OCA*, 551 F.3d at 369 (quoting *Jenkins & Gilchrist v. Groia & Co.*, 542 F.3d 114, 119 (5th Cir. 2008)).

    [104] *See Dierschke*, 975 F.2d at 184 ("when the court finds an intentional failure of responsive pleadings there need be no other findings"); *CJC Holdings, Inc. v. Wright & Lato, Inc.,* 979 F.2d 60, 63 (5th Cir. 1992) (a willful failure to respond "would certainly not constitute excusable neglect" under Rule 60(b)); *Hargray v. City of New Orleans*, 12 F.3d 1099 (5th Cir. 1999) (stating that a willful failure to answer indicates a lack of good cause); *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) ("A finding of willful default ends the inquiry, for when the court finds an intentional failure of responsive pleadings there need be no other finding.") (quoting *Dierschke***,** 975 F.2d at 184) (quotation marks omitted); *Jenkins & Gilchrist*, 542 F.3d at 120 ("if a district court finds a defendant's default to be willful, then the district court need not make any other finding"); *OCA*, 551 F.3d at 370 (if district court makes finding of willfulness, "we may hold that it was within its discretion in refusing to grant relief from a default judgment").

complaint here was willful.  Willful default is an intentional
failure to respond to litigation.[105]  Here, Cisal admits that it
intentionally failed to respond to this litigation.  It claims
that it failed to appear in this action because it acted on the
advice of its counsel, who held the view that Cisal's connections
with Louisiana were minimal, and a court in Louisiana could not,
under these circumstances, exercise personal jurisdiction over
Cisal.  Once Cisal learned that the letters rogatory were
requested to be served upon it, it consulted with its counsel.
Cisal's counsel challenged service of the letters rogatory in the
Brazilian Superior Federal Court, which, after several rounds of
appeals, eventually ruled that an American court could serve
Cisal regardless of whether it had jurisdiction.[106]  This ruling
was upheld on appeal.[107]  Cisal contends that it continued to
believe that its contacts with Louisiana were insufficient to
support a court's exercise of personal jurisdiction over it.

Cisal very plainly "chose not to answer the complaint in
this case because it did not believe the Court had jurisdiction
over it and did not want to submit itself to foreign

---

[105] *See Lacy*, 227 F.3d at 292 (quoting *Dierschke*, 975 F.2d at
184); *see also OCA*, 551 F.3d at 370 n.32.

[106] R. Doc. 141-3 at 2-3.

[107] *Id.*  The record does not contain a copy of this judgment.
The information about the Brazilian court's holdings comes from
an affidavit supplied by Cisal's attorney, Carlos Frederico
Nobrega Farias.

jurisdiction."[108]  One of its Brazilian attorneys, Carlos

Frederico Nobrega Farias, avers that he did not believe that this

Court had jurisdiction over Cisal and that he did not want to

submit to the Court's jurisdiction.[109]  He stated that once Cisal

received the letters rogatory he presented the board of directors

with two options: it could answer the complaint or it could

further pursue its remedies in Brazilian court.  He states that

he "advised the board that if Cisal appeared in the United States

court to defend against the lawsuit, it would submit itself to

the United States' jurisdiction," and it would undermine its

challenges to the letters in Brazilian court.[110]  Farias's

affidavit does not indicate whether he advised Cisal that it

could mount a jurisdictional challenge in an American court.

Another of Cisal's attorneys, A. Nabor A. Bulhões, a Brazilian

lawyer with evident expertise in Brazilian and international law,

also filed an affidavit stating that American courts cannot enter

a judgment binding against Cisal in Brazil because Cisal objected

to the jurisdiction of U.S. courts and has not appeared and

submitted to those courts' jurisdiction.  He further stated that

he "expressly advised Cisal not to appear and submit to the US

_____

[108] R. Doc. 141-1 at 5; *see also* R. Doc. 141-3 at 2-4
(affidavit of Carlos Frederico Nobrega Farias).

[109] R. Doc. 141-3 at 4.

[110] *Id.* at 3.

37

Court's jurisdiction since it did not do business in the United States, only shipped goods purchased by others and the case should be brought to Brazil where all witnesses as to the role of Cisal were located."[111]

Accordingly, Cisal explains that its intentional failure to acknowledge this litigation was done at the advice of counsel. But it has pointed to no authority that would indicate that reliance on advice of counsel somehow precludes a finding of willfulness, nor has it adduced any evidence that it did not intentionally fail to answer the complaint. Even when attorneys act as agents on behalf of their clients, the clients, as principals, are typically bound by the actions of their attorneys.[112] But this is not even the case here. Cisal's

---

[111] R. Doc. 178-4 at 1-2. It should be noted that the affidavits from Cisal's attorneys do *not* state that their opinion was that Cisal was somehow unable to contest jurisdiction in an American court without conceding jurisdiction there. The statements of both lawyers indicate that they advised Cisal not to appear and concede jurisdiction or defend on the merits. They are silent on whether they raised the issue of whether Cisal could challenge personal jurisdiction in the United States court. Farinas, for example, advised Cisal that if it "appeared in the United States court *to defend against the lawsuit*, it would submit itself to the United States jurisdiction." R. Doc. 141-3 at 3 (emphasis added). Bulhões similarly advised Cisal "not to appear *and submit to the US Court's jurisdiction*." R. Doc. 178-4 at 2.

[112] *See, e.g., Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'Ship*, 507 U.S. 380, 396-97 (1993). In certain circumstances, a litigant may be relieved from the effect of a default judgment that resulted from "a technical error or a slight mistake" by the litigant's attorney. *See, e.g., Blois v. Friday*, 612 F.3d 938, 940 (5th Cir. 1980). Cisal's failure to

attorneys were not acting as its agent.  Instead, Cisal relied on the *advice* of its attorneys, who make clear that they presented Cisal with the option of answering the complaint and Cisal declined that option.[113]  And, in response to a question concerning American law, Cisal made the decision to rely on the advice of two attorneys whose specialities are in Brazilian and international law, who do not appear to have any expertise with the law of the United States, and who were evidently unable to discover Rule 12(b)(2) of the Federal Rules of Civil Procedure.

In addition, Cisal has a 50% ownership stake in TPS, which is incorporated under the laws of Minnesota, has a principal place of business in Louisiana, and it ships goods to a number of American ports.  It is thus extremely unlikely that Cisal would have had any trouble locating competent counsel to advise it on U.S. law.  Nevertheless, there is no indication that Cisal sought the advice of attorneys with a familiarity with American law when it was served with process, when default was entered against it, when the Court granted Cooper's motion for default judgment, when it held an evidentiary hearing on the default judgment, when such

---

participate in this litigation at all can hardly be described as a technical error or slight mistake.    *See also Inman v. Am. Home Furniture Placement, Inc.*, 120 F.3d 117, 119 (8th Cir. 1997) ("Litigants choose counsel at their peril.  While it may seem harsh to make defendants answer for their attorney's behavior, any other result would punish [plaintiff] for her opponents' lawyer.  Defendants are better suited to bear this risk.").

[113] R. Doc. 141-3 at 4.

a judgment was entered, or at any point until, many months after the entry of judgment, Cooper began to seize Cisal's assets in the United States. This constitutes a clear record of intentional failure to participate in the lawsuit. In addition, if this Court were to hold that reliance on the advice of counsel — regardless of the counsel's expertise or accuracy — negates a finding of willfulness, the case law on willfulness would be rendered a virtual nullity.

Cisal further argues that a "defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds."[114] This is true. But this principle only establishes that a party does not concede personal jurisdiction by failing to appear. It does not stand for the proposition that a party — after receiving full notice of a pending lawsuit against it and declining to appear because it believes personal jurisdiction is lacking — is immunized from the consequences of default when it turns out that its jurisdictional beliefs were in error. It is clear from the record that Cisal made the conscious decision to evade this litigation after being served, even though it had sufficient contacts with Louisiana to have its half-owned subsidiary and exclusive U.S. distributor with a principal place of business

---

[114] *Jackson*, 302 F.3d at 522 (quoting *Ins. Corp. of Ireland*, 456 U.S. at 706).

there, and even though it could have consulted U.S. counsel on the proper course of action but evidently declined to do so.

It is true that courts favor trials on the merits.[115] It cannot be denied, however, that Cisal had a full and fair opportunity to present its objections to personal jurisdiction and, if unsuccessful on those grounds, to defend against Cooper's lawsuit on the merits. But it chose to do neither. Instead, with full knowledge of these proceedings, it continually failed to appear until, after the Court entered a default judgment, it became clear that Cooper could use this judgment to seize Cisal's assets in the United States. Cisal was served in November of 2007, and since this time Cooper has spent considerable time and expense adjudicating this suit, securing a default judgment, demonstrating damages, and locating Cisal's assets.[116] The policy in favor of respecting finality is strong,[117] especially when a defendant seeks to disrupt a final judgment that was entered due to its own failure to object to its entry. Furthermore, it is

_____

[115] *See Seven Elves*, 635 F.2d at 403.

[116] Even if Cooper had not expended this time and effort, denial of Cisal's motion would still be appropriate. *See, e.g., Dierschke*, 975 F.2d at 184 ("Assuming no prejudice to the plaintiffs and that Diershke had meritorious defenses does not automatically overcome the willful failure to answer. Willful failure alone may constitute sufficient cause for the court to deny this motion."); *see also Alan Neuman Prods. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989).

[117] *See Seven Elves*, 635 F.2d at 403.

likely that if Cisal's attorneys indeed provided faulty advice, Cisal could attempt to recover through a malpractice action.[118]

It is additionally true that the judgment in this case is a significant one. Courts have, however, held that the size of a default judgment does not outweigh other factors, such as a party's intentional failure to participate in litigation.[119] Although this judgment is considerable, its size is hardly extraordinary.[120] The consequences of Cisal's intentional failure to respond to litigation may be steep, but they are a risk that

---

[118] *See Inman*, 120 F.3d at 119.

[119] *See, e.g., id.* (Rule 55(c) context); *Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 857 (8th Cir. 1996).

[120] *See, e.g., Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 365 & n.1 (1973) (noting that the $145 million default judgment below had been affirmed by the court of appeals); *Dexia Credit Local v. Rogan*, 602 F.3d 879, 881 (7th Cir. 2010) (noting that district court entered $124 million default judgment after defendant left the country); *Cadle Co. v. Neubauer*, 562 F.3d 369, 370 (5th Cir. 2009) (noting that district court entered $48 million default judgment); *Jackson v. Fratelli Tanfoglio Di Tanfoglio Bortolo & C.S.N.C.*, 310 Fed. App'x 629, 629-30 (5th Cir. 2009) (court below entered $11 million default judgment); *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 163 (2d Cir. 2004) (affirming denial of motions to vacate $136 million default judgment entered when defendants failed to respond to complaint); *Casio Computer Co., Ltd. v. Noren*, 35 Fed. App'x 247 (affirming $33.1 million default judgment against defendant who missed court appearances and failed to answer the complaint or to file responsive motions); *Philips Med. Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 212 (7th Cir. 1992) (affirming $19 million default entered under Rule 37 and noting that "[t]hough the size of this default judgment is extraordinary, we affirm the district court because of [defendant's] utter disregard for such procedural niceties as showing up for depositions and obeying court orders to remain in the country").

Cisal took when it deliberately ignored this suit against it.

The Court therefore finds that Cisal's failure to respond was willful. Because numerous controlling decisions hold that this finding alone is sufficient to deny relief from a default judgment, the Court holds that Cisal is not entitled to relief from the judgment entered against it.


**III. Conclusion**

For the foregoing reasons, Cisal's motion is DENIED.



New Orleans, Louisiana, this ___9th___ day of June, 2010.



_____
      SARAH S. VANCE
UNITED STATES DISTRICT JUDGE